KENDRA PENNINGROTH (#18649)
**CONSUMER ATTORNEYS**
8245 North 85th Way
Scottsdale, AZ 85258
Telephone: (480) 626-1447
Fax: (718) 715-1750
Email: kpenningroth@consumerattorneys.com

*Attorneys for Plaintiff John Doe*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOHN DOE,<br><br>　　　　　Plaintiff,<br>v.<br><br>RENTGROW, INC.,<br><br>　　　　　Defendant. | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Case No. |

John Doe ("Plaintiff" or "Mr. Doe") by and through his counsel brings the following Complaint against RentGrow, Inc., ("Defendant" or "RentGrow") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of a tenant screening report that Defendant published to Plaintiff's potential landlord, which inaccurately reported on Plaintiff's consumer file.

## **INTRODUCTION**

1. This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2. Defendant is a consumer reporting agency ("CRA") that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports, also known as tenant screening

1

reports, generated from its database and furnishes these tenant screening reports to mortgage brokers, landlords, and property management companies who use the reports to make decisions regarding prospective borrowers and tenants.

3.     Defendant assembled and published an inaccurate tenant screening report to Plaintiff's prospective landlord, San Marino Apartments.

4.     Defendant inaccurately reported to Plaintiff's prospective landlord criminal records that were expunged and should not have been reported at all. Defendant's reporting is therefore grossly inaccurate and stigmatizing.

5.     Additionally, the case number cited by RentGrow relates to a traffic violation case for another individual, not the Plaintiff.

6.     Plaintiff's prospective landlord denied Plaintiff's housing application after receiving the tenant screening report from Defendant, in which Defendant published the inaccurate information regarding Plaintiff.

7.     Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available underlying public court records from Salt Lake County, Utah, regarding the offense prior to publishing the information to Plaintiff's prospective landlord.

8.     Had Defendant performed even a cursory review of the underlying public court records, it would have discovered that the underlying conviction was expunged and that the case number referencing the case actually belonged to another individual.

9.     Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

10. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking housing by prejudicing their prospective landlords with inaccurate information.

11. Defendant's inaccurate report cost Plaintiff the ability to rent the apartment unit that was suitably accommodating of his needs, causing him physical injury as a result of emotional distress, embarrassment, inconvenience, anxiety, fear of homelessness, and significant financial loss.

12. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time and money trying to correct the tenant screening report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

13. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

**PARTIES**

14. John Doe ("Plaintiff" or "Mr. Doe") is a natural person residing in Salt Lake City, Utah and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15. Defendant RentGrow Inc. ("Defendant" or "RentGrow") maintains its principal place of business at 307 Waverly Oaks Road, Suite 301, Waltham, MA 02452, and regularly conducts business in this judicial district, and can be served with process by way of its registered agent, Corporation Service Company, located at 211 E. 7th Street, Suite 620, Austin, TX 78701.

16. Among other things, Defendant sells consumer reports, often called tenant screening reports, to mortgage brokers, property management companies, and landlords for their use in deciding whether to rent or otherwise offer housing to a prospective tenant. These reports are provided in connection with a business transaction initiated by the consumer.

17. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for tenant screening purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

20. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

21. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the

confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

22. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

23. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

### THE FCRA'S PROTECTIONS FOR HOUSING APPLICANTS

24. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates tenant screening reports like the one Defendant prepared in Plaintiff's name.

25. The FCRA provides a number of protections for housing applicants who are the subject of tenant screening reports for the purpose of securing housing and credit.

26. In the parlance of the FCRA, tenant screening reports are "consumer reports," and providers of tenant screening reports, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

27. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

28. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

29. Defendant disregarded its duties under the FCRA with respect to Plaintiff's tenant screening report.

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

30. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records. As a result of the increasing availability of this data, there has been a boom in the tenant screening industry.

31. Tenant Screening Reports are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating tenant screening reports.

32. Tenant Screening companies, like Defendant, collect millions of records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

33. Given that Defendant is in the business of selling tenant screening reports, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

34. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

35. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

36. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

37. An appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting an expunged misdemeanor, which should not have been included in Plaintiff's consumer report.

38. As a provider of tenant screening reports, the Defendant should be aware of the FCRA requirements and should be a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

**A.     Plaintiff Expunged his 1988 Criminal Conviction**

39. In or around January 2020, Plaintiff undertook efforts to expunge a criminal conviction that dated back to February of 1988 for an offense that had occurred in December of 1987.

40. Plaintiff paid approximately $160 dollars, and expended time and labor, to expunge such record, in compliance with Utah law that sanctions the expungement of such records.

41. Accordingly, Plaintiff's efforts to expunge such conviction resulted in such criminal conviction (hereinafter, the "Expunged Record") being expunged and erased from the public record.

42. By letter dated January 27, 2020, Plaintiff received correspondence from the Utah Department of Public Safety, BCI Expungement Staff, which informed him that the record in question, the Expunged Record, had been expunged and effectively removed from his records.

**B.   Plaintiff Applies For Housing With San Marino Apartments**

43. Given that the Plaintiff's existing apartment lease was scheduled to expire on October 5, 2023, Plaintiff commenced a search for suitable apartment rental, so that he would not remain unhoused after October 5, 2023.

44. Plaintiff was particularly keen on finding an apartment that was in convenient proximity to both his workplace and romantic partner.

45. Therefore, on or about September 20, 2023, Plaintiff visited San Marino Apartments ("San Marino") with the intention of securing a new lease, during which visit he was provided a guided tour of the premises.

46. After taking the tour, the Plaintiff's excitement was notably piqued by the apartment's convenient proximity to both his workplace and his romantic partner's residence, and further affording him the ability to traverse between those locations without needing to rely on his car for transport.

47. Furthermore, the property featured desirable amenities, including a pool, a 24-hour fitness center, and well-kept grounds.

48. Consequently, in September 2023, Plaintiff submitted a rental application to San Marino Apartments with the intent of securing an apartment.

**C.   Defendant Published an Inaccurate Tenant Screening Report to San Marino Apartments**

49. On or about September 26, 2023, San Marino requested Plaintiff's rental screening report from RentGrow.

50. On or about September 26, 2023, RentGrow provided Plaintiff's rental screening report to San Marino.

51. The rental screening report from RentGrow disclosed a stigmatizing criminal conviction, the Expunged Record, with an inaccurate case number reported therein.

52. RentGrow reported the Expunged Record despite the Expunged Record having been expunged nearly four years earlier, in January 2020.

53. Accordingly, the Expunged Record should not have been included in Plaintiff's rental screening report.

54. Furthermore, RentGrow reported the Expunged Record as having incurred a significant incarceration period, and then indicating a "Sentence Status" of "Active."

55. Together, RentGrow's report thereby indicated to third parties, including San Marino, that Plaintiff was currently, actively, incarcerated (!).

56. Moreover, the case number reported as being associated with the Expunged Record and Plaintiff does not align with Plaintiff's Expunged Record at all. Instead, it pertained to a traffic violation matter involving another unrelated individual.

57. A cursory review of the widely available underlying public court records clearly confirms that the Plaintiff had successfully expunged this criminal record. It therefore becomes evident that the inclusion of this criminal record in the report should not have occurred.

58. The sole reason for the inaccurate criminal reporting was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the tenant screening report it sold about Plaintiff to Plaintiff's prospective landlord.

59. Therefore, in preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective landlord inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**D.    San Marino Denies Plaintiff's Housing Application**

60. On or around September 26, 2023, Plaintiff received a call from San Marino, but being unable to answer at the time, he promptly returned the call. During this conversation, the leasing agent conveyed the regrettable news that Plaintiff would be unable to secure the planned residence due to a concerning background check disclosure.

61. Plaintiff felt utterly humiliated, both from the highly stigmatizing nature of the Expunged Record that was contained in his RentGrow-provided background report, and also in that he had personally assured San Marino that he had no criminal records, and he was now made out to be a bold-faced liar.

62. In response to San Marino's reaction to the RentGrow report, Plaintiff indicated his intention to dispute the RentGrow report's inclusion of the Expunged Record to the leasing agent.

63. Subsequently thereafter, Plaintiff also received an adverse action letter dated to September 26, 2023, from San Marino denying Plaintiff's applications and identifying Plaintiff's criminal history as the sole reason for the denial.

**E.    Plaintiff's Dispute Submitted To RentGrow**

64. Shortly thereafter, Plaintiff obtained a copy of the tenant screening report and was shocked and humiliated upon reviewing the grossly stigmatizing conviction contained within the tenant screening report.

65. Desperate to secure housing with San Marino and riddled with worry over the far-reaching impacts of the inaccurate information, Plaintiff disputed the inaccurate information with Defendant.

66. On or about October 4, 2023, Plaintiff disputed the matter via email with RentGrow.

67. In his dispute, Plaintiff disputed the Expunged Record that RentGrow had reported in its background report as being inaccurate and not a reflection of the public record.

68. Upon information and belief, on or about October 18, 2023, Plaintiff received from RentGrow an acknowledgement of its receipt of Plaintiff's dispute.

69. On or about October 18, 2023, Plaintiff received Defendant's correspondence confirming that it had reinvestigated Plaintiff's dispute, and attaching a corrected background report that no longer reflected or included the Expunged Record.

**F.     Plaintiff's Additional Damages Sustained**

70. Due to the exigency of the situation and the urgent need to vacate his prior residence by October 5, 2023, and being deprived the San Marino apartment as a result of Defendant's conduct, Plaintiff was left stranded, homeless, and without anywhere to go.

71. As a result, Plaintiff was forced to move into the home of a close relative, on an emergency and temporary basis.

72. Plaintiff's relative informed Plaintiff that, at most, he can reside in her home until October 19, 2023, on which date she was hosting other guests.

73. Accordingly, Plaintiff resided in his relative's home between the dates of October 5, 2023, and October 19, 2023.

74. Further, Plaintiff's relative had been hosting houseguests even on dates between October 5, 2023, and October 19, 2023, such that Plaintiff was forced to sleep multiple nights in his vehicle.

75. In moving into his relative's home, Plaintiff was forced to enlist the services of movers that relocated his belongings to his relative's residence, into her garage.

76. Pressed by the urgency of securing a new accommodation, Plaintiff continued his search for a suitable place to reside, ultimately moving into an alternative apartment on October 19, 2023.

77. However, because of the emergency circumstances surrounding Plaintiff's securing of the new apartment, this new apartment lacked the appealing amenities of his previous choice and was notably farther from both his workplace and his romantic partner's residence.

78. Consequently, Plaintiff found himself frequently reliant on his car for commuting, and the process entailed hiring movers once again to facilitate the transition of belongings from his relative's home to his new apartment, both of which – the moving and the reliance on a vehicle – imposed additional and significant burdens upon Plaintiff, such as by requiring Plaintiff to expend hundreds of dollars in additional costs, and dozens of hours in additional time.

79. Although RentGrow had corrected its inaccurate reporting by October 18, 2023, Plaintiff had already been locked-in a six-month lease in a new, and undesirable and burdensome, apartment.

80. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

81.     Notably, Plaintiff works in an industry that depends on building strong, personal relationships that are based on trust. However, Defendant's conduct has shattered Plaintiff's confidence in his ability to build such relationships or maintain such current relationships.

82.     In particular, Plaintiff works hard to maintain a strong personal reputation of trust, competence, and accountability. Indeed, Plaintiff's credit score of approximately 800 is demonstrative of those efforts.

83.     However, while Plaintiff resided in his relative's home because he himself was homeless, and while Plaintiff's belongings were stored in his relative's garage, Plaintiff's relative's house guests – which, over a period of two weeks, were numerous, and some of whom were acquainted with Plaintiff – became aware that Plaintiff was denied an apartment and had no place to live, and that he was storing belongings in the relative's garage on an emergency basis.

84.     All of this added to the sheer humiliation and shame that Plaintiff experienced as a result of Defendant's violative conduct.

85.     But worse still, Plaintiff's business and professional reputation – and Plaintiff's confidence in his ability to maintain those – has been utterly shattered, because Plaintiff feels that others view him, or may view him, as a failure and question his ability to comport himself, let alone manage others' finances, in a competent and successful manner.

86.     Plaintiff has suffered professionally and financially as a result.

87.     Beyond the quantifiable damages resulting from the loss of an opportunity to secure a superior apartment that was better maintained, one that offered more luxurious amenities, and proximity to the Plaintiff's workplace and romantic partner, the Plaintiff was compelled to reside with his parents due to a lack of viable alternatives. Furthermore, he incurred substantial expenses in the process of moving, an expenditure precipitated by RentGrow's erroneous reporting.

88. In addition to the financial ramifications, the Plaintiff endured a range of emotional and psychological distress. These adverse effects included feelings of humiliation before the leasing manager, Plaintiff's romantic partner, and Plaintiff's friends and family, as well as a mix of anger, worry, and fear stemming from the prospect of potential homelessness. The emotional toll further encompassed distress, damage to the Plaintiff's reputation, anxiety, frustration, sleep disturbances, loss of appetite, and a significant investment of time. To address these challenges and rectify the situation, the Plaintiff also incurred substantial attorney's fees.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

89. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

90. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

91. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

92. At all times pertinent hereto, the above-mentioned tenant screening report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

93. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the tenant screening report it sold about Plaintiff as well as the information it published within the same.

94. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of housing opportunities; loss of time and money trying to correct the tenant screening report; the expenditure of labor and effort disputing and trying

to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

95. Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

96. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

a) Determining that Defendant negligently and/or willfully violated the FCRA;

b) Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c) Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: December 6, 2023,    Respectfully submitted,

*/s/ Kendra Penningroth*
KENDRA PENNINGROTH (#18649)
**CONSUMER ATTORNEYS**
8245 North 85th Way
Scottsdale, AZ 85258
T: (480) 626-1447
F: (718) 715-1750
E: kpenningroth@consumerattorneys.com

*Attorneys For Plaintiff John Doe*